# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL BYRON GAGE,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Case No.: 08-C-5040** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g), plaintiff Michael Byron Gage seeks judicial review of a decision denying his application for Disability Insurance Benefits ("DIB"). The parties have filed cross-motions for summary judgment. Mr. Gage seeks a judgment reversing the final decision or remanding it to a new Administrative Law Judge ("ALJ") for review. Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), seeks a judgment affirming the final decision. For the reasons set forth below, Mr. Gage's motion is denied [dkt 18] and the Commissioner's motion is granted [dkt 19].

## PROCEDURAL HISTORY

On November 17, 2004, Mr. Gage filed an application for DIB, claiming that he became disabled due to a left elbow injury.[1] On May 9, 2005, the Social Security Administration ("SSA") denied his application.[2] On May 19, 2005, upon reconsideration, the SSA denied his application

---

[1] R. at 27.
[2] R. at 43-46.

again.[3] Mr. Gage requested a hearing before an ALJ on the proceedings of his case.[4] On February 28, 2008, ALJ Barbara Welsch conducted a hearing on Mr. Gage's claim and took testimony from several witnesses.[5] On April 24, 2008, the ALJ issued an unfavorable decision.[6] The ALJ held that Mr. Gage was not disabled at any time from December 7, 1999, through the date last insured, December 31, 2004.[7] Mr. Gage requested a review of the ALJ's decision and on July 22, 2008, the Appeals Council denied Mr. Gage's request for review.[8] This denial made the ALJ's decision the final decision of the Commissioner.[9] Mr. Gage now seeks review of the ALJ's decision.

STATEMENT OF FACTS

The facts set forth under this section provide a review of Mr. Gage's background, the events leading to his application for DIB, his medical history, testimony at his ALJ hearing, and the ALJ's decision.

**A. Background Information**

Mr. Gage was born on June 13, 1956.[10] He has an eighth grade education and can both read and write.[11] Mr. Gage worked as a union laborer from November of 1980 until December of 1999.[12] As a laborer he performed various tasks including pouring concrete, assisting brick layers, laying blacktop, cleaning up hazardous materials, and flagging traffic.[13] At times he served as foreman at

---

[3]R. at 36-39.
[4]R. at 33.
[5]R. at 470.
[6]R. at 14-25.
[7]R. at 14.
[8]R. at 5-6B, 10.
[9]20 C.F.R. § 404.981.
[10]R. at 27.
[11]R. at 474-75.
[12]R. at 102.
[13]R. at 109, 476.

his work, supervising ten to fifteen people.[14] He has not been employed since December 7, 1999, when he injured his left arm while working.[15]

**B. The Accident And The Medical Record Before The DIB Application**

On December 7, 1999, Mr. Gage heard a popping noise from his non-dominant left arm while lifting roughly fifty pounds of concrete forms at work.[16] He visited the emergency room where he was diagnosed with a left elbow strain.[17] He was prescribed conservative treatment including ice, rest, elevation, and physical therapy.[18] Mr. Gage continued to experience pain, swelling, and gripping problems through the winter and spring of 2000.[19]

In August of 2000, Mr. Gage consulted Pietro Tonio, M.D., an Assistant Professor at the Department of Orthopaedic Surgery and Rehabilitation at Loyola University Medical Center in Maywood, Illinois.[20] Dr. Tonio diagnosed Mr. Gage with lateral epicondylitis.[21] Lateral epicondylitis is the inflamation of the outer, lower end of the humerus.[22] He stated that Mr. Gage had full range of motion in the left elbow, tenderness over the lateral epicondyle, and pain on elevation, arm extension, and maximum pronation.[23] At this point, Mr. Gage was capable of full right handed work and was capable of lifting ten pounds with his left hand, though he avoided repetitive and overhead use of his left upper extremity.[24] Dr. Tonio recommended lateral epicondylitis surgery.[25]

---

[14]R. at 109.
[15]R. at 475.
[16]R. at 169, 270, 444.
[17]R. at 169.
[18]R. at 168-69, 215.
[19]R. at 209-219, 420-21.
[20]R. at 175-76.
[21]R. at 175-76.
[22]ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, E-139-40 (J.E. Schmidt, M.D., ed., 2008).
[23]R. at 175-76.
[24]R. at 176.
[25]R. at 176.

On October 9, 2000, Paul Perona, M.D., conducted surgery on Mr. Gage at St. Margaret's Hospital in Spring Valley, Illinois, for left elbow extensor origin debridement.[26] This surgery involved removing all dead tissue and contaminating material from certain muscles in the left elbow.[27] Rehabilitation services followed the surgery.[28] In November of 2000, upon postoperative examination, Dr. Perona noted that Mr. Gage's range of motion was improving in the left elbow but that he still lacked strength and felt pressure there.[29] Dr. Perona stated that he would allow Mr. Gage to return to light duty work involving the right hand only and predicted that Mr. Gage could return to unrestricted work within one month of the November 2000 visit.[30]

In May of 2001, Michael Cohen, M.D., a doctor at the Joliet Medical Group in Joliet, Illinois, examined Mr. Gage.[31] Dr. Cohen noted that Mr. Gage had full range of motion of his left elbow but that it was tender in several places, including over the lateral epicondylar region.[32] Dr. Cohen administered a cortisone injection, a hormone frequently used to treat arthritis, and recommended a night splint for Mr. Gage's left arm.[33] Dr. Cohen placed a ten pound weight restriction on Mr. Gage's left arm.[34]

On May 17, 2001, Dr. Perona saw Mr. Gage again.[35] Dr. Perona noted that Dr. Cohen's cortisone injection did not improve Mr. Gage's symptoms and that Mr. Gage continued to have pain and tenderness in the left elbow.[36] Dr. Perona diagnosed Mr. Gage with left elbow lateral

---

[26]R. at 258-78.
[27]ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, D-19, E-249.
[28]R. at 188-200.
[29]R. at 371-72.
[30]R. at 371.
[31]R. at 225-26.
[32]R. at 225.
[33]R. at 226; ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, C-469.
[34]R. at 226.
[35]R. at 351.
[36]R. at 351.

epicondylitis and left elbow cubital tunnel syndrome.[37] Cubital tunnel syndrome, marked by pain and numbness in the forearm and hand, is a condition resulting from a compression or an injury of the ulnar nerve in the elbow.[38] Dr. Perona administered another cortisone injection and recommended physical therapy.[39] On June 12, 2001, and July 10, 2001, Dr. Perona conducted follow-up examinations on Mr. Gage.[40] After little improvement and continued pain in the left elbow, Dr. Perona suggested re-debridement of the left lateral epicondyle.[41] On August 20, 2001, Mr. Gage underwent a second debridement surgery, followed by physical therapy.[42]

From August of 2001 to January of 2002, after Mr. Gage's second surgery, Dr. Perona conducted frequent postoperative examinations on Mr. Gage.[43] He noted that Mr. Gage experienced continued pain in the left arm and occasional numbness in the fingers.[44] Dr. Perona also noted during these months that Mr. Gage was not working because no light work was available.[45] On January 10, 2002, after a postoperative examination, Dr. Perona stated that Mr. Gage would have a permanent disability due to left hand grasp limitations and lifting restrictions.[46] Dr. Perona recommended that Mr. Gage start vocational training.[47] In May of 2002, Dr. Perona stated that Mr. Gage's condition would require intermittent if not constant use of anti-inflammatory medication.[48] The doctor also recommenced a Functional Capacity Test ("FCT").[49]

---

[37]R. at 351.
[38]ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, C-516.
[39]R. at 351.
[40]R. at 348, 345.
[41]R. at 345-46.
[42]R. at 344.
[43]R. at 221, 324, 327, 335, 339.
[44]R. at 221, 324, 327, 335, 339.
[45]R. at 324.
[46]R. at 322.
[47]R. at 322.
[48]R. at 320.
[49]R. at 320.

In June of 2002, Barb Peterson, P.T., of the Center for Industrial Rehab in Peru, Illinois, conducted a FCT on Mr. Gage.[50] The FCT results stated that Mr. Gage had no apparent limitations in sitting, standing, or walking.[51] The results stated that Mr. Gage could frequently (2.5 to 5.5 hours per day) climb stairs, crouch, kneel, and balance while he could occasionally (zero to 2.5 hours per day) crawl.[52] Mr. Gage could occasionally grasp items firmly with his left hand and frequently grasp items simply with his left hand.[53] Mr. Gage could occasionally lift 19.6 pounds above his left shoulder and could occasionally carry up to thirty-two pounds with his left arm.[54]

There is little evidence in the record of Mr. Gage's contact with medical professionals in 2003. In January of 2004, Dr. Perona completed a Proof of Disability Form for the Central Laborers' Pension Fund.[55] Dr. Perona stated that Mr. Gage had injured his left elbow resulting in an occupational disability from December 7, 1999, through January 15, 2004.[56] Dr. Perona stated that Mr. Gage was released to work with a five pound weight restriction on the left arm.[57] On March 19, 2004, Dr. Perona conducted a final examination and prognosis on Mr. Gage.[58] Dr. Perona diagnosed Mr. Gage with left elbow lateral epicondylitis and left upper extremity cubital tunnel syndrome.[59] Dr. Perona considered the lateral epicondylitis to be a permanent condition while noting that the cubital tunnel syndrome might improve with surgery.[60] Dr. Perona did not recommend further

---

[50]R. at 463-66.
[51]R. at 465.
[52]R. at 465.
[53]R. at 466.
[54]R. at 466.
[55]R. at 416-17.
[56]R. at 417.
[57]R. at 417.
[58]R. at 444-45.
[59]R. at 444.
[60]R. at 444.

surgery immediately.[61] He recommended a permanent restriction of five pounds to the upper left extremity.[62] Dr. Perona strongly recommended that Mr. Gage look for non-labor intensive work requiring no heavy or repeated lifting.[63]

## C. The Medical Record After The DIB Application

In January of 2005, Aftab Khan, M.D., S.C., of the Illinois Department of Rehabilitation Services conducted a physical examination of Mr. Gage at the request of the Bureau of Disability Services for Springfield, Illinois.[64] Dr. Khan rated Mr. Gage's grip strength in his left hand at "4/5," where a rating of 5/5 represents the most functional grip.[65] Dr. Khan noted that Mr. Gage was unable to lift even five pounds with his left hand because of pain in the left elbow.[66] Dr. Khan went on to note that Mr. Gage could turn a doorknob, tie and untie his shoes, and button and unbutton his shirt.[67] Dr. Khan reported that, with the exception of left elbow pain, the patient was stable and the examination unremarkable.[68] In February of 2005, Stanley Burris, a medical consultant, conducted a Physical Residual Functional Capacity Assessment on Mr. Gage.[69] In this assessment, Mr. Burris stated that Mr. Gage had pain in his left elbow, reducing his range of motion and grip strength.[70] Mr. Burris also stated that Mr. Gage was limited to lifting twenty pounds occasionally and ten pounds frequently with the left arm.[71]

In March of 2005, Mr. Gage sought an evaluation of his right knee due to pain that had

---

[61]R. at 445.
[62]R. at 445.
[63]R. at 445.
[64]R. at 422-27.
[65]R. at 424.
[66]R. at 425.
[67]R. at 425.
[68]R. at 426.
[69]R. at 429.
[70]R. at 429.
[71]R. at 429.

begun one month earlier.[72] Mr. Gage described this pain as severe and stated that he had given up basic activities because of it.[73] Rafia Saleem, M.D., of the Department of Radiology at the Community Hospital of Ottawa, conducted a radiological examination on Mr. Gage.[74] This examination revealed mild degenerative changes in the knee and patellofemoral joint.[75] The patellofemoral joint is the area where the knee cap and thigh bone join.[76] Dr. Saleem's impression was that Mr. Gage was suffering from mild osteoarthritis, which is a form of joint disease characterized by overgrowth of bone and degeneration of cartilage associated with joints.[77] In May of 2005, Dr. Perona also examined Mr. Gage for right knee problems.[78] Dr. Perona's impression was that Mr. Gage might have a femoral condyle osteochondral defect.[79] This refers to a bone and cartilage defect of the  rounded eminence at the end of the thigh bone which enters into the formation of a joint with another bone.[80]

In May of 2006, Michael Harney, D.O., who has seen Mr. Gage many times since the accident, but it is not clear from the record for what treatment, wrote a letter on Mr. Gage's behalf.[81] The record does not state whether Dr. Harney produced this letter *sua sponte* or at Mr. Gage's request. The letter described Mr. Gage's left elbow problems and also stated that Mr. Gage suffered from a degenerative disease in his right knee.[82] Dr. Harney stated that the knee disease would require

---

[72] R. at 441.
[73] R. at 441.
[74] R. at 438-39.
[75] R. at 438-39.
[76] ATTORNEYS' DICTIONARY OF MEDICINE Vol. 4, P-104.
[77] R. at 439; ATTORNEYS' DICTIONARY OF MEDICINE Vol. 4, O-114.
[78] R. at 450.
[79] R. at 450.
[80] ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, C-399, F-53, Vol. 4, O-116.
[81] R. at 181, 449.
[82] R. at 449.

total knee replacement and would prevent him from obtaining gainful employment.[83] Dr. Harney stated that Mr. Gage should be considered totally disabled.[84]

In November of 2007, Robert Eilers, M.D., FAAPM&R, examined Mr. Gage.[85] It is not clear from the record why Mr. Gage visited Dr. Eilers in 2007 after seeing Dr. Saleem and Dr. Perona in 2005. Dr. Eilers noted that left elbow pain made completing everyday activities such as shopping, cooking, dressing, and yard work difficult for Mr. Gage.[86] Dr. Eilers noted reduced strength in Mr. Gage's upper left extremity and significant pain on palpation over the lateral epicondyle.[87] Dr. Eilers noted crepitus in the right knee, a discharge of gas, and a palpable cyst in the right knee, a sac containing fluid and imbedded in bodily tissue.[88] Dr. Eilers stated that this cyst limited Mr. Gage's physical mobility.[89] Dr. Eilers also took note of Mr. Gage's left lateral epicondylitis.[90] Dr. Eilers opined that Mr. Gage's physical limitations would prevent him from obtaining gainful employment in the Ottawa, Illinois area.[91] Specifically, Dr. Eilers stated that certain medications would prevent Mr. Gage from performing clerical or sedentary tasks.

## D. Evidence At Mr. Gage's ALJ Hearing

Mr. Gage's hearing in front of ALJ Barbara Welsch occurred on February 28, 2008.[92] The ALJ, Mr. Gage, Mr. Gage's attorney, Mr. Gage's sister, and Dennis Gustafson, a vocational expert ("VE"), were all present at the hearing.[93] Mr. Gage testified that he has a eighth grade education and

---

[83]R. at 449.
[84]R. at 449.
[85]R. at 457-61.
[86]R. at 458.
[87]R. at 459.
[88]R. at 459; ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, C-493, C-540.
[89]R. at 460.
[90]R. at 460.
[91]R. at 460-61.
[92]R. at 470.
[93]R. at 470.

that he is working towards completing a GED.[94] Mr. Gage stated that he has had no other schooling or vocational training.[95] Mr. Gage stated that he is unable to work due to constant pain in his left arm and lack of sleep.[96] Mr. Gage stated that he naps frequently during the day.[97] Additionally, Mr. Gage testified that his right knee is unstable and frequently in pain.[98] This pain, he stated, would prevent him from walking long distances.[99] He testified that he is able to wash and dress himself, cook, clean dishes, care for his dogs, and drive, though these tasks are completed with difficulty.[100] He testified that he is unable to go fishing or camping but is able to garden with assistance.[101] He stated that he had traveled outside the state about a year before the ALJ hearing, though he did not drive and he had to make frequent stops while in transit.[102]

Mr. Gustafson also testified at Mr. Gage's hearing.[103] The ALJ questioned Mr. Gustafson about a hypothetical individual's ability to perform various jobs.[104] The ALJ asked Mr. Gustafson to assume that this individual was between forty-three and fifty-one years old with an eighth grade education and past relevant work experience similar to that of Mr. Gage.[105] Mr. Gustafson was to assume that the individual was unable to lift more than five pounds on the left and was unable to lift any weight over his left shoulder.[106] Additionally, Mr. Gustafson was to assume that this individual had a left hand grip strength of "4 out of 5."[107] The hypothetical also provided that grasp on the left

---

[94] R. at 474.
[95] R. at 474.
[96] R. at 477.
[97] R. at 491.
[98] R. at 488-89.
[99] R. at 488-89.
[100] R. at 477-83.
[101] R. at 481-82, 491-92.
[102] R. at 483.
[103] R. at 496.
[104] R. at 496.
[105] R. at 496.
[106] R. at 496.
[107] R. at 497.

hand would be limited to forty-one at position one, sixty-four at position two, fifty-nine at position three, and sixty-four at position four.[108] Mr. Gustafson interpreted these figures to mean pounds of force on a hand dynamometer.[109] A dynamometer is an instrument used for measuring the strength of muscular contraction.[110] Mr. Gustafson was to assume that this individual could lift from a squat position up to forty five pounds on the left, seventy pounds on the right, and eighty five pounds bilaterally.[111] This individual would be limited to light, sedentary work and would be unable to climb ladders, ropes, or scaffolding.[112] He would also be unable to work in extreme cold.[113] Finally, the hypothetical included limitations with the non-dominant left elbow.[114]

Mr. Gustafson testified that this hypothetical individual would be unable to perform work similar to the past relevant work of Mr. Gage.[115] Past relevant work would be heavy or very heavy work, not light, sedentary work as required by the hypothetical.[116] Mr. Gustafson stated that no past skills would be transferable to new work.[117] The VE next testified that unskilled, entry-level, light, sedentary work would be available to this hypothetical individual.[118] He stated that in Illinois there are approximately 2,634 light work amusement and recreation attendant jobs, such as arcade attendant.[119] Additionally, there are 3,276 courier and messenger jobs, such as outside deliverer or office helper.[120] There are also 2,738 interviewer jobs in Illinois, such as survey worker.[121] Mr.

---

[108]R. at 497.
[109]R. at 497.
[110]ATTORNEYS' DICTIONARY OF MEDICINE Vol. 2, D-235.
[111]R. at 498.
[112]R. at 496.
[113]R. at 496.
[114]R. at 496.
[115]R. at 499.
[116]R. at 499.
[117]R. at 499.
[118]R. at 499.
[119]R. at 499.
[120]R. at 499.
[121]R. at 500.

Gustafson noted that this hypothetical individual would be unable to perform manufacturing, food service, or cleaning work due to physical disabilities and would be unable to perform many other jobs due to education level.[122]

Mr. Gustafson testified that the above statistics are consistent with the Dictionary of Occupational Titles ("DOT").[123] He stated that the hypothetical individual would be able to sit at a recreational attendant job but not necessarily at will.[124] Mr. Gustafson added that the recreational attendant jobs could be performed with one functional arm and with the other arm acting only in an assist capacity.[125] Mr. Gage's counsel then interrupted Mr. Gustafson's testimony and asked Mr. Gage a series of questions. During this questioning, Mr. Gage noted that moving his left elbow increases pain and that he would have difficulty standing for more than a few minutes at a time.[126] The ALJ then briefly resumed questioning Mr. Gustafson.[127] Mr. Gustafson testified that using an arm in an assist capacity would not involve using that arm repetitively.[128] Rather, he testified, the arm would be used only to assist the dominant arm.[129]

**E. The ALJ's April 24, 2008 Decision**

On April 24, 2008, the ALJ ruled that Mr. Gage was not disabled during the alleged disability period.[130] The ALJ followed the five step evaluation process outlined in 20 C.F.R. § 404.1520.[131] She determined that Mr. Gage last met the insured status requirement of the Social

---

[122]R. at 500.
[123]R. at 505.
[124]R. at 506-07.
[125]R. at 508.
[126]R. at 509.
[127]R. at 510.
[128]R. at 510-11.
[129]R. at 511.
[130]R. at 14.
[131]R. at 14-15.

Security Act on December 31, 2004.[132] She then determined that Mr. Gage had not engaged in substantial gainful activity from the alleged onset date of December 7, 1999, to the date last insured.[133] She also determined that Mr. Gage had severe impairments under 20 C.F.R. § 404.1520(c) due to left elbow lateral epicondylitis and left cubital tunnel syndrome.[134]

The ALJ then completed a residual functional capacity ("RFC") determination.[135] The RFC determination limited Mr. Gage to light work with the following restrictions: (i) no lifting greater than five pounds with the left arm; (ii) no over shoulder reaching with the left arm; (iii) no work requiring strong or tight grip on the left hand.[136] The ALJ relied extensively on the opinions of Dr. Perona in making her RFC determination.[137]

The ALJ rejected further limitations as not supported by the medical findings.[138] Specifically, the ALJ chose not to give the opinions of Dr. Harney and Dr. Eilers controlling weight.[139] She stated that Dr. Harney was "apparently a sympathetic doctor attempting to help his patient obtain disability benefits..."[140] She also noted that Dr. Harney's opinions were not given controlling weight because they were made over a year after the claimant's date last insured and because there was no indication that he had "any vocational expertise which would support his opinion."[141] The ALJ stated that Dr. Eilers opinions would not be given controlling weight because the examination was completed "almost three years after the date last insured" and because "the examination was apparently done

---

[132]R. at 16.
[133]R. at 16.
[134]R. at 16.
[135]R. at 17-19.
[136]R. at 18.
[137]R. at 17-18.
[138]R. at 18.
[139]R. at 18-19.
[140]R. at 19.
[141]R. at 18-19.

at the request of claimant's representative for the sole purpose of bolstering the claimant's claim for disability benefits."[142] She also noted that Dr. Eilers commented on numerous vocational issues "outside his area of expertise."[143]

The ALJ then stated that Mr. Gage's impairments did not meet or equal a listed impairment in the Social Security regulations.[144] The ALJ considered Mr. Gage's subjective pain in her analysis but determined that the severity and limiting effects of the pain were not supported by medical evidence.[145] Finally, the ALJ determined that there were jobs that existed in significant numbers in the national economy which Mr. Gage could have performed during the period of disability.[146] She considered Mr. Gage's RFC determination, age, education, and work experience during this step.[147] She also relied on testimony from the VE in determining that Mr. Gage could perform certain work.[148]

## STANDARD OF REVIEW

This Court will conduct a *de novo* review of the ALJ's conclusions of law while the ALJ's factual determinations are entitled to deference.[149] This Court will uphold the ALJ's decision if the it is free from legal error and is supported by substantial evidence.[150] Evidence is substantial if it is "sufficient for a reasonable person to conclude that the evidence supports the decision."[151] This Court will view the record as a whole but will not re-weigh the evidence or substitute its own

---

[142]R. at 19.
[143]R. at 19.
[144]R. at 20.
[145]R. at 21-23.
[146]R. at 23-24.
[147]R. at 23-24.
[148]R. at 24.
[149]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006) (*citing Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005)).
[150]42 U.S.C. § 405(g); *Overman v. Astrue*, 564 F.3d 456, 462 (7th Cir. 2008).
[151]*Prochaska*, 454 F.3d at 735 (*citing Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002)).

judgment for that of the ALJ.[152] If conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not this Court.[153]

## SOCIAL SECURITY REGULATIONS

It will be helpful to outline the Social Security regulations before analyzing Mr. Gage's arguments. Social Security regulations mandate that an ALJ conduct a five-step evaluation when determining whether a plaintiff is disabled.[154] The ALJ must determine: (1) whether the claimant is working and whether the work is substantial gainful activity; (2) whether the claimant has any impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; (3) whether the claimant's impairment meets or equals any impairment listed in the Social Security regulations as precluding gainful activity; (4) whether the claimant's impairment prevents him from performing his past relevant work; (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[155] An ALJ must also conduct an RFC determination between step three and step four should the ALJ give a negative answer at step three.[156] A finding of disability requires an affirmative answer at either step three or step five while a negative answer at any step other than step three precludes a finding of disability.[157] The plaintiff has the burden of proof at all steps except step five where the Commissioner has the burden of proof.[158]

---

[152]*Overman*, 564 F.3d at 462 (*citing Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir.2000)).
[153]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).
[154]20 C.F.R. § 404.1520(a).
[155]20 C.F.R. § 404.1520(b)-(g).
[156]20 C.F.R. § 404.1520(a)(4).
[157]20 C.F.R. § 404.1520(d), (g).
[158]*Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

ANALYSIS

Mr. Gage raises several arguments. He first argues that the ALJ erred in not giving controlling weight to the opinions of his treating doctor. Second, Mr. Gage argues that the ALJ erred when she did not fully set forth his impairments when questioning the VE. Specifically, he contends that the ALJ did not include his pain as a limiting factor when she posed hypothetical questions to the VE. Third, Mr. Gage argues that the ALJ improperly discredited the allegations of subjective pain despite objective medical evidence of an underlying physical condition, which could cause that pain. Finally, he argues that the ALJ erred in analyzing the representative sample jobs at step five of her analysis. The Court will address these arguments in turn.

## A. The ALJ Did Not Err In Giving Controlling Weight To The Opinions Of Dr. Perona.

Mr. Gage first argues that the ALJ erred in her disability determination because she improperly declined to give controlling weight to the opinions of Mr. Gage's treating physician. Specifically, he argues that the ALJ gave controlling weight to a report authored by Mr. Burris, a state agency reviewing physician. This report stated that Mr. Gage was able to lift and/or carry ten pounds with his left arm.[159] Mr. Gage argues that the ALJ should have given controlling weight to his treating doctor, though it is not clear from his brief which doctor that should have been because a number of doctors treated Mr. Gage including Dr. Khan, Dr. Perona, and Dr. Eilers.[160]

The Commissioner argues that the ALJ's finding that Mr. Gage could perform light work was supported by the opinions of several treating, examining, and reviewing doctors, including Dr. Perona. The Commissioner argues that the ALJ properly rejected the opinions of Dr. Harney because they were not time-relevant and were not supported by the record evidence as a whole. The

_____

[159]R. at 429.
[160]R. at 422-27, 444-45, 457-61.

17

Commissioner also notes that the ALJ properly rejected Dr. Khan's opinion that the plaintiff could not lift even five pounds with his left hand because this opinion was supported by the plaintiff's subjective complaints rather than medical evidence in the record.

A treating physician's opinions regarding the nature and severity of a claimant's injuries receive controlling weight when they are "'well-supported by medically acceptable clinical and laboratory diagnostic techniques'" and are "'consistent with substantial evidence in the record.'"[161] A treating physician's opinions often deserve controlling weight because the treating doctor has been able to observe the claimant personally, over an extended period of time.[162] A treating physician's opinions may be unreliable, though, because the treating doctor is often sympathetic with the patient, finding a disability too quickly.[163] The ALJ, therefore, may discount a treating physician's opinions if they are inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints.[164]

In the instant case, the ALJ properly gave controlling weight to the opinions of Mr. Gage's treating physician, Dr. Perona. The ALJ's RFC determination states that Mr. Gage is limited "to light work with no lifting greater than 5 pounds with the left arm, no over shoulder reaching with the left arm and no jobs that require a strong or tight grip on the left."[165] These limitations are taken directly from Dr. Perona's 2004 final exam and prognosis on Mr. Gage.[166] Dr. Perona was certainly one of Mr. Gage's treating physicians in that he observed the claimant personally, treated him over

---

[161]*Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (*quoting* 20 C.F.R. § 404.1527(d)(2)) (*citing Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)).

[162]*Ketelboeter*, 550 F.3d at 625.

[163]*Id.* at 625 (*citing Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985), and *Schmidt*, 496 F.3d at 842).

[164]*Ketelboeter*, 550 F.3d at 625 (*citing White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005), and *Skarbek*, 390 F.3d at 503).

[165]R. at 18.

[166]R. at 17.

an extended period of time, and performed two of his surgeries.[167] Additionally, Dr. Perona's opinions are consistent with the substantial evidence in the record because they are generally consistent with Dr. Khan's opinions, and Dr. Perona's reports comprise a substantial portion of the record.[168] Therefore, contrary to Mr. Gage's contentions, the ALJ did, in fact, give controlling weight to Mr. Gage's treating physician.

Though Mr. Gage did not specify which doctor's opinions he believes should have been given controlling weight, for the purposes of a full analysis, we will review whether the ALJ properly gave controlling weight to Dr. Perona instead of Dr. Harney, Dr. Eilers, and Dr. Khan. The ALJ properly notes that Dr. Harney's opinions should not be given controlling weight under 20 C.F.R. § 404.1527.[169] It is not clear from the record whether Dr. Harney actually saw Mr. Gage for problems associated with his disability claim, though it is clear that he has treated Mr. Gage on several occasions.[170] The ALJ noted that Dr. Harney's opinion was made almost a year and a half after the claimant's date last insured and that his comments about Mr. Gage's knee pain were not linked to actual medical findings prior to his date last insured.[171] These opinions were also inconsistent with Dr. Khan's and Dr. Perona's opinions.[172] Because Dr. Harney's opinions were inconsistent with substantial evidence in the record, the ALJ properly found they did not merit controlling weight.[173] The ALJ also rejected Dr. Harney's opinions because she found Dr. Harney to be "a sympathetic doctor attempting to help his patient obtain disability benefits."[174] The ALJ

---

[167] R. at 226, 320-22, 324, 327, 335, 339, 345-48, 371-72, 444-45.
[168] R. at 226, 320-22, 324, 327, 335, 339, 345-48, 371-72, 444-45.
[169] R. at 18.
[170] R. at 181.
[171] R. at 18.
[172] R. at 19.
[173] *See Schmidt*, 496 F.3d at 842 (holding that a doctor's opinion does not merit controlling weight because the opinion was not supported by medical evidence in the record).
[174] R. at 19.

19

correctly cited Seventh Circuit law in rejecting Dr. Harney's opinions for this reason.[175]

The ALJ also did not err in refusing to lend controlling weight to Dr. Eilers's opinions. She noted that Dr. Eilers' examination was conducted almost three years after the date last insured.[176] His opinions, then, are irrelevant in determining Mr. Gage's condition from the alleged onset date to the date last insured.[177] Additionally, the ALJ notes that Dr. Eilers conducted his examination at the request of Mr. Gage's representative "for the sole purpose of bolstering the claimant's claim..."[178] The ALJ noted that Dr. Eilers opined extensively on matters better suited for a VE, including the transferability of Mr. Gage's skills.[179] The ALJ properly rejected Dr. Eilers' opinions because, under social security regulations, a doctor's opinion that the claimant is disabled or unable to work should not have significant weight on a disability determination.[180]

The ALJ does not explicitly reject Dr. Khan's opinions.[181] Dr. Khan examined Mr. Gage in January of 2005.[182] The ALJ notes that the "consultative physical examination in January 2005," was "mostly consistent" with her RFC determination.[183] Because Dr. Khan's opinions are consistent with the RFC determination, they are also consistent with Dr. Perona's opinions which comprise the great weight of the medical findings.[184] The ALJ properly dismissed any discrepancies between Dr. Khan's opinions and the RFC determination.[185] She stated that "claimant's subjective

---

[175] *Ketelboeter*, 550 F.3d at 625 (citations omitted).
[176] R. at 19.
[177] *Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008) (noting that evidence post-dating plaintiff's date last insured fails to support the claim that plaintiff was disabled during the period of disability).
[178] R. at 19.
[179] R. at 19-20.
[180] *See* 20 C.F.R. § 404.1527(e)(1).
[181] R. at 17-18.
[182] R. at 424.
[183] R. at 18.
[184] R. at 18.
[185] R. at 18.

statements/subjective presentation that he can not lift even 5 pounds with his left hand" during Dr. Khan's examination are not credible and more weight is to be given to Dr. Perona's opinions.[186] The ALJ properly gave more weight to the medical evidence and the opinions of Dr. Perona than the subjective opinions of Mr. Gage.[187]

**B. The ALJ Did Not Err When Questioning The VE.**

Mr. Gage next argues that the ALJ erred by not fully setting forth Mr. Gage's impairments when questioning Mr. Gustafson, the VE. Mr. Gage contends that, when questioning a VE, the ALJ must fully set forth the claimant's impairments to the extent that they are supported in the record. He argues that the ALJ erred by not including pain an individual such as Mr. Gage experiences when posing hypothetical questions to the VE. Specifically, Mr. Gage notes that the ALJ ignored the fact that he experiences significant pain unless his arm is cradled at his side.

The Commissioner argues that the ALJ in the instant case was not required to include the claimant's pain in a hypothetical question posed to a VE. The Commissioner argues that determining the extent to which a claimant's pain limits his functional abilities is a legal determination reserved for the ALJ. The Commissioner also argues that the ALJ's hypothetical, which mirrors the ALJ's RFC determination, accounted for all of plaintiff's limitations.

We start by noting that the decision of whether to question a VE is within the discretion of the ALJ.[188] Questioning a VE is not a required or essential part of the ALJ's hearing.[189] If an ALJ relies on a VE's testimony, the hypothetical question she poses to the VE "must incorporate all of

---

[186]R. at 18.
[187]20 C.F.R. § 404.1529(a).
[188]*Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 543, 540 (7th Cir. 1992).
[189]*Id.* at 540.

the claimant's limitations supported by medical evidence in the record."[190] It is important for the VE to understand the full extent of the claimant's disabilities so that she knows what work the claimant can truly perform.[191] An ALJ, however, need not include in the hypothetical a limitation alleged by the plaintiff if the ALJ finds that limitation unsupported by the evidence in the record.[192] If the ALJ's hypothetical appears to adequately reflect the plaintiff's work related limitations, then the hypothetical is not faulty.[193]

We find that the hypothetical posed to the VE was proper. The ALJ included in her hypothetical all limitations that she found supported by the medical evidence. The ALJ's hypothetical mirrors her RFC determination. The RFC determination stated that Mr. Gage was limited to: (i) no lifting greater than five pounds with the left arm; (ii) no over shoulder reaching with the left arm; (iii) no work requiring strong or tight grip on the left hand.[194] The hypothetical posed to the VE included all of the above limitations and more.[195] It also included grip limitations more detailed than those in the RFC determination.[196] The ALJ also instructed the VE to assume the hypothetical individual was roughly the same age as Mr. Gage and had the similar education and past relevant work experience to that of Mr. Gage.[197]

It is true, as Mr. Gage notes, that the ALJ did not include pain in his hypothetical to the VE. The ALJ, however, specifically rejected the contention that Mr. Gage's subjective pain restricted

---

[190]*Indoranto v. Barnhart*, 374 F.3d 471, 474 (7th Cir. 2004) (citations omitted).

[191]*Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) (*citing Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2004)).

[192]*See Ehrhart*, 969 F.2d at 540 (noting that the ALJ's hypothetical was proper because it reflected the claimant's impairments to the extent that the ALJ found them supported by the evidence).

[193]*See Cass v. Shalala*, 8 F.3d 552, 556 (7 th Cir. 1993).

[194]R. at 18.

[195]R. at 496.

[196]R. at 497.

[197]R. at 496.

his work ability beyond the limitations already set forth in the RFC determination.[198] She stated that "the degree of pain and limitation alleged by the claimant... is not consistent with the objective medical evidence regarding these impairments as discussed above, or his functional ability..."[199] Because the ALJ believed that the hypothetical adequately reflected all of Mr. Gage's work limitations and believed that the severity of Mr. Gage's pain was not supported by the medical evidence, she did not need to include Mr. Gage's subjective pain when questioning the VE.[200]

## C. The ALJ Did Not Improperly Discredit Mr. Gage's Allegations Of Subjective Pain.

Mr. Gage next argues that the ALJ improperly discredited his allegations of subjective pain despite objective medical evidence of an underlying physical condition likely to cause that pain. Mr. Gage argues that the ALJ should have considered the following seven factors when evaluating Mr. Gage's subjective pain: (i) his daily activities; (ii) the location, duration, frequency, and intensity of his pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication he takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, he receives or has received for relief of his pain or other symptoms; (vi) any measures he uses or has used to relieve pain or other symptoms; and (vii) other factors concerning his functional limitations and restrictions due to pain or other symptoms.

The Commissioner argues that the ALJ properly considered the record as a whole and considered the appropriate factors when evaluating the credibility of Mr. Gage's pain. The Commissioner argues that it was reasonable for the ALJ to think that Mr. Gage's ability to perform an array of activities undercuts his allegations of pain.

_____

[198] R. at 21-23.
[199] R. at 22.
[200] See Ehrhart, 969 F.2d at 540.

An ALJ is to consider all of a claimant's symptoms, including pain, when making a disability determination.[201] The ALJ, however, need not consider a claimant's subjective pain if the subjective pain is not reasonably consistent with the objective medical evidence.[202] Mr. Gage is correct in noting that an ALJ is to consider the seven factors listed above when evaluating a claimant's pain.[203] The seven factors analysis, though, assumes that the subjective pain is consistent with the medical record.[204]

We note from the outset that, contrary to Mr. Gage's contention, the ALJ did conduct a seven factor analysis. The ALJ first acknowledged the location, frequency, and duration of Mr. Gage's regular pain in both his left arm and his right knee.[205] She then discussed Mr. Gage's daily activities including cooking, caring for his dogs, visiting with others, and caring for personal hygiene needs.[206] She discussed factors that aggravate his pain, his medications and their side effects, including stomach pain, and his surgeries.[207] These discussions encompassed the seven factor analysis because they considered Mr. Gage's daily activities, the location and duration of pain, activities that aggravate his pain, treatment, medication, and more.[208]

Moreover, the ALJ justifiably rejected the degree and limiting effects of Mr. Gage's pain because his subjective contentions were inconsistent with the medical record.[209] The ALJ did not hold, as Mr. Gage contends, that Mr. Gage is pain free. Rather, she simply stated that the degree and impact of that pain is not credible because it is inconsistent with the medical record and because it

---

[201]20 C.F.R. § 404.1529(a).
[202]*See Zurwaski v. Halter*, 245 F.3d 881, 887 (7th Cir 2001); 20 C.F.R. § 404.1529(a).
[203]20 C.F.R. § 404.1529(c)(3)(i)-(vii).
[204]20 C.F.R. § 404.1529(c)(3)(i)-(vii).
[205]R. at 19-20, 22.
[206]R. at 22.
[207]R. at 19-20, 22.
[208]20 C.F.R. § 404.1529(c)(3)(i)-(vii).
[209]R. at 21-22.

does not further limit his work ability.[210] The ALJ noted, despite pain, that Mr. Gage is able to watch television, read, cook, wash dishes, care for dogs, drive, and draw.[211] The ALJ also noted that Mr. Gage is able to spend time outdoors with others, garden with assistance, and care for his personal hygiene needs independently.[212] The ALJ cited to several pieces of medical evidence indicating that Mr. Gage's left arm is functional, though with limitations.[213] The ALJ also noted that Mr. Gage's knee pain should not be considered because there is no medical evidence that it existed during the period of disability.[214] The ALJ, then, reasonably rejected the degree and limiting effect of Mr. Gage's subjective pain because it was not reasonably consistent with the objective medical evidence.[215]

**D. The ALJ Did Not Err In Analyzing The Representative Sample Jobs.**

Mr. Gage argues, last, that the ALJ erred in analyzing the representative sample jobs in step five of her analysis. Mr. Gage argues that there is no evidence that he could use his left arm in an assisting capacity, preventing him from performing the sample jobs. Mr. Gage also argues that he would not be able to perform the sample jobs with the use of only one arm. Mr. Gage further argues that the ALJ did not consider pain when determining that he could perform sample jobs and that she did not consider pain in the hypothetical to the VE. Consideration of subjective pain has already been discussed in the above sections of this analysis. The Court will, however, consider Mr. Gage's ability to use his left arm in the ALJ's analysis of sample jobs. The Commissioner does not specifically address this argument but argues that substantial evidence supports the ALJ's

---

[210]R. at 22.
[211]R. at 22.
[212]R. at 22.
[213]R. at 22.
[214]R. at 22.
[215]*See Zurwaski v. Halter*, 245 F.3d 881, 887 (7th Cir 2001); 20 C.F.R. § 404.1529(a).

determination that Mr. Gage could perform the sample jobs.

At step five, an ALJ is to consider the RFC determination, age, education level, and work experience in determining whether a claimant can make an adjustment to other work.[216] When an ALJ determines that unskilled, sedentary, light jobs exist in the national economy, as is the case here, the ALJ will take notice of governmental publications such as the DOT.[217] The ALJ may also use a VE in determining whether the claimant is able to perform other work.[218] If a claimant cannot make an adjustment to other work, the ALJ shall find that the claimant is disabled.[219] This court will not overturn the ALJ's decision if it is supported by substantial evidence.[220]

In the instant case, the ALJ did not err in analyzing the representative sample jobs nor did she err in determining that Mr. Gage could use his left arm in an assist capacity. The ALJ stated that, even with the limitations from the RFC and from Mr. Gage's education level, there were a number of jobs available that Mr. Gage was capable of performing.[221] In stating this and in finding that Mr. Gage could lift five pounds and could grip, albeit weakly, with his left hand, the ALJ relied on the opinions of Mr. Gage's treating doctor, Dr. Perona, as well as the opinions Dr. Khan.[222] The evidence the ALJ relied on is extensive, including numerous reports from Dr. Perona.[223] In arguing that he is unable to use his left arm, Mr. Gage, it seems, relies on the opinions of Dr. Harney and Dr. Eilers. The ALJ properly rejected the opinions of these doctors as is noted above. Because substantial evidence supports the ALJ's determination that Mr. Gage could use his left arm in an

---

[216]20 C.F.R. § 404.1520(a)(4)(v).
[217]20 C.F.R. § 404.1566(d)(1).
[218]20 C.F.R. § 404.1566(e).
[219]20 C.F.R. § 404.1520(g)(1).
[220]20 42 U.S.C. § 405(g); *Young*, 362 F.3d at 1000; *Overman*, 564 F.3d at 462.
[221]R. at 24.
[222]R. at 17-18.
[223]R. at 17.

assist capacity, this Court will not overturn that decision.[224]

CONCLUSION

For the reasons set forth above, the Court denies Mr. Gage's motion [dkt 18]and grants the Commissioner's motion [dkt 19].


**IT IS SO ORDERED**

**ENTERED: August 17, 2009**  _____

                                      **Susan E. Cox**
                                      **UNITED STATES MAGISTRATE JUDGE**

---

[224]*See* 20 42 U.S.C. § 405(g); *Young*, 362 F.3d at 1000; *Overman*, 564 F.3d at 462.